UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

CONSTANCE HAUMAN and
CHANNEL CREATIONS LLC
d/b/a ISOTOPIA RECORDS,                          Case No.

     Plaintiffs,              Plaintiffs demand trial by jury
            of all claims so triable.

  -against-

MIASHA FISHER,

     Defendant.
------------------------------------------------------x

**COMPLAINT FOR VIOLATION OF THE LANHAM ACT, TRADEMARK
INFRINGEMENT, BREACH OF CONTRACT, TORTIOUS INTERFERENCE,
<u>BREACH OF FIDUCIARY OBLIGATIONS, AND ABUSE OF PROCESS</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

THE HISTORY OF THE RELATION BETWEEN THE PARTIES . . . . . . . . . . . . . . . 4

THE REGISTRATION APPLICATION TO THE PTO . . . . . . . . . . . . . . . . . . . . . . . . 10

THE STATE SUPREME COURT LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

THIS COURT HAS JURISDICTION OVER THE ENTIRE CONTROVERSY . . . . . . 15

FIRST CAUSE OF ACTION
(Infringement of Service Mark; Lanham Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SECOND CAUSE OF ACTION
(N.Y. Gen. Business Law § 360-L) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

THIRD CAUSE OF ACTION
(Breach of Contract) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

FOURTH CAUSE OF ACTION
(Tortious Interference with Contract) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

FIFTH CAUSE OF ACTION
(Breach of Fiduciary Obligations) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SIXTH CAUSE OF ACTION
(Abuse of Process) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SUMMARY OF DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

DEFENDANT'S WEALTH AND MALICIOUS INTENT . . . . . . . . . . . . . . . . . . . . . . . 23

RELIEF DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Plaintiffs CONSTANCE HAUMAN and CHANNEL CREATIONS LLC d/b/a ISOTOPIA RECORDS, by their attorneys, Law Office of Richard A. Altman and Tiajoloff & Kelly LLP, for their complaint against defendant, allege as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. This is an action for infringement of a service mark, arising under the Lanham Trademark Act 15 U.S.C. §§ 1051 et seq. (the "Lanham Act"), unfair competition under the New York General Business Law § 360 et seq.

2. In addition, plaintiffs seek damages and a preliminary and permanent injunction against the defendant, because of violation of plaintiffs' due process rights under the U.S. and State Constitutions, breach of fiduciary obligations, and breach of contract.

3. Essentially, this action seeks legal and equitable relief against a former member of a funk/rock band who abruptly quit, in violation of her contractual and fiduciary obligations, and has now arrogated to herself the claim of ownership of the name of the band and rights appurtenant thereto.

4. Plaintiffs are the sole creators and originators of the name of the band, which is "Miss Velvet and the Blue Wolf" (the Band). They have used it in commerce extensively, and have a presumptive exclusive right to that service mark of the Band.

5. Defendant, who is a former member of the Band, and was an employee of the plaintiffs, is claiming without legal or factual basis that she has the sole and exclusive right to the name of the Band, has attempted to steal the good will and reputation of the Band for

her own purposes, and is violating plaintiffs' exclusive rights to the service mark "Miss Velvet and the Blue Wolf."

6.   In pursuit of this false claim, the defendant has obtained an unlawful and unconstitutional order from the New York State Supreme Court, purporting to bar plaintiffs from pursuing and enforcing their federal trademark rights and using the name of the Band.

7.   As a direct result of defendant's actions, the plaintiffs have suffered loss of revenue, confusion of origin and damage to reputation.

8.   That Court has also unconstitutionally violated plaintiffs' rights by indefinitely extending a "temporary" restraining order without providing for an undertaking.

9.   Moreover, in the process of litigating in the New York State Supreme Court, the defendant and her counsel have tortiously interfered with plaintiffs' rights and property, and caused plaintiffs to incur significant expenses.

10.  Plaintiffs seek by this action a determination that they have a right to registration of the service mark, that they are the sole and exclusive owners thereof, and compensatory and punitive damages against the defendant.

## JURISDICTION AND VENUE

11.  This Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a) and (b).

12.  This Court has original jurisdiction over the claims for violation of the plaintiffs' constitutional rights to due process of law.

13.   This Court also has supplemental jurisdiction over the state law claims, based upon 28 U.S.C. § 1367(a).

14.   This Court also has diversity jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1332(a)(1), in that the parties are citizens of different States and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

15.   This Court has personal jurisdiction over defendant, because she was in New York when she performed the actions complained of, and her attorneys, who are present in New York, were and are her agents.

16.   Venue in this district is proper under 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## THE PARTIES

17.   Plaintiff Constance Hauman is an individual who resides in and is a citizen of New York, New York, in this district.

18.   Plaintiff Channel Creations LLC d/b/a Isotopia Records, is a New York Limited Liability Company with a principal place of business in this district.

19.   Plaintiff Hauman is by profession a singer, songwriter, record producer, record label owner and performer. She has performed in opera houses and stages all over the world.

20.   Plaintiff Hauman is the sole owner and CEO of plaintiff Channel.

21.  Defendant Miasha Fisher is a citizen of California at the commencement of this action, although she was a citizen of New York at the time of the actions complained of herein.

## THE HISTORY OF THE RELATION BETWEEN THE PARTIES

22.  Plaintiff Hauman and defendant Fisher met in 2006, when the latter was 18 years of age. Plaintiff Hauman was defendant Fisher's vocal teacher and vocal coach, and was paid by the lesson. Their long relationship began when defendant came Paris to study with Ms. Hauman for several weeks when the latter lived there in that year.

23.  At some point that year, Ms. Hauman took defendant to a U-2 concert. Defendant said then "this is what I want to do." Thereafter, Ms. Hauman and the defendant worked nearly daily, with the objective of preparing defendant to audition for music schools.

24.  As a result of their working together, defendant was accepted to enroll in the Manhattan School of Music. But only three months later, she quit.

25.  In 2008, defendant's mother again asked plaintiff Hauman to work with defendant, to prepare her for an audition with the prestigious American Musical and Dramatic Academy in New York City.

26.  Again, plaintiff Hauman's devoted work with the defendant caused her to be accepted into the AMDA. And several months later, defendant again quit.

27.  In 2010, the defendant personally reached out to plaintiff Hauman, begging to work with her again.

-4-

28.  Plaintiff Hauman's daily vocal work with defendant made her (Hauman) realize that a possible way to break this pattern of quitting would be to assemble a rock band, and to write songs and arrangements that would fit the voice that defendant was developing.

29.  To that end, plaintiff Hauman found defendant a manager, named Eddie Applebaum. He initially disagreed with plaintiff Hauman's assessment, and directed her to a more pop style, but that failed.

30. Once more, in 2015 defendant came back to plaintiff Hauman, asking what she should do. Plaintiff Hauman knew from years of working with her that the only possibility of success would be to create a band with her.

31.  During the time that Applebaum managed the failed pop/dance experiment, plaintiff Hauman had already formed a band, and called it The Blue Wolf.

32.  So finally, in 2015, "Miss Velvet and the Blue Wolf" was born. It contained a total of six musicians, including horn players, guitarist, bass, and drums with plaintiff Hauman as the music director, leading from the keyboards. Defendant Fisher was the solo singer and front woman.

33.  Applebaum was still defendant's manager, and tried to find a record deal for the demo recording which plaintiff Hauman had produced under the name Miss Velvet and The Blue Wolf.  That deal fell through, as also did an appearance at the SXSW Festival in 2016.

34.  As a result, of that failure, defendant fired Applebaum.

35.  Plaintiff Hauman suggested that, given she was the producer and creative director of the demo, she would produce the final product and release it on her label Isotopia Records.

36.  Defendant agreed, and the release was highly successful.

37.  Thereafter, the band performed continuously and widely from 2016 to 2020, and became known as Miss Velvet and the Blue Wolf ("the Band"). It was prominently featured in music media, and produced and sold recordings which became highly ranked on Billboard and other services.

38.  Through the plaintiffs' efforts, the Band was signed to UAA (Universal Attractions Agency) in the fourth quarter of 2019, for performances throughout the US in the coming year.

39.  The Band was enormously successful until the onset of the COVID pandemic in March 2020, when it was suddenly no longer able to perform in public.

40.  In April 2020, defendant announced that she was pregnant. She said that she would marry in August of 2020, and planned her wedding so that she would be available in 2021 to stick to the plan of touring and recording a third album in the fall of 2020. So the release of the record in June 2021 would coincide with the  performances which had been rescheduled for that time, when it was assumed that public performances could again take place. Plaintiff Hauman agreed with this plan.

41.  Thereafter, all proceeded according to the plan. Defendant gave birth in January 2021. Rehearsals were scheduled to resume in June 2021, and an animated video and single were to be released on July 7.

42.  The Band was scheduled to appear at the post-pandemic re-opening of Central Park's Summerstage on June 27, 2021, as an opening act for George Clinton and his group, Parliament Funkadelic, with whom the band had toured extensively in 2018 and 2019. Plaintiff Hauman has had a long-standing professional relationship with Clinton, the well-known and beloved musician who has been performing since the 1960's.

43.  On June 25, 2021, defendant told the Band members on WhatsApp that she was in fact "coming back."

44.  But privately, she told plaintiff Hauman that she was *not* coming back to perform on Summerstage, and to "handle it."

45.  Plaintiff Hauman responded by telling her that the Band would play without her, and play the only instrumental song on the new album.

46.  She further told defendant that the Band was obligated to perform its contractual obligations with or without her (Fisher), and that she (Hauman) would perform so as to be able to preserve its good relations with Clinton, the booker  Universal Attractions, and the venue, Central Park Summerstage.

47.  Defendant Fisher responded, telling plaintiff Hauman that she (Hauman) was not allowed to say that the Band was Miss Velvet and The Blue Wolf.

-7-

48.   Plaintiff Hauman argued that that was ridiculous, because she could simply explain to the audience that Miss Velvet couldn't make it.

49.   Defendant responded, "NO that is fucked," and plaintiff Hauman told her that the Band could only perform as The Blue Wolf.

50.   This willful behavior had happened before, in 2019, when the defendant didn't show up to play at the Grammy Award Lifetime Achievement party honoring George Clinton.

51.   On June 29, 2021, defendant abruptly quit the Band on a WhatsApp thread.

52.   On several occasions, defendant signed agreements for performances, acknowledging that she was an employee of the plaintiffs, the most important one being with Universal Attractions. A copy of the agreement is annexed as Exhibit A.

53.   By her abrupt quitting, she violated her fiduciary obligations to her employer.

54.   By her abrupt quitting, she made it impossible for the plaintiffs to comply with several appearances which had already been contracted for from the fall of 2021 into the spring of 2022.

55.   By her abrupt quitting, she caused plaintiffs to be in default of previously arranged contractual commitments, to plaintiffs' financial and reputational damage.

56.   Defendant also told plaintiff Hauman that if Isotopia released the already-scheduled-and-paid-for third album, that she (defendant) would sue her.

Case 1:23-cv-06366   Document 1   Filed 07/22/23   Page 11 of 27

57. In response, because of defendant's quitting, plaintiff Hauman was forced to pull the record from all digital sales platforms, cancel the costly radio campaign, and pull the video which had been made.

58. Monies were still owed to people who were shocked that the album was being pulled, and plaintiffs have been forced to make good on the commitments which defendant violated and caused to be violated.

59. By her precipitous and petulant actions, defendant caused plaintiffs to be in breach of various contractual agreements which had been made, damaged the value of the good will of the service mark and forced them to incur enormous expense in undoing the damage she had caused.

60. Following her resignation, defendant remained in Europe and Israel during most of 2021. In September 2021, she moved to Malibu, California into a gigantic beach compound. Since then, she has had a second child.

61. In February 2023 she began the release of three solo singles under the name "Miss Velvet," publicly claiming that the pursuit of a solo career was the reason that she quit the Band and moved to California.

62. Defendant has since quitting used the name Miss Velvet and also the name The Blue Wolf in connection with her pursuit of her solo career, without any right to do so.

63.  While she has the right to pursue her solo career, she has no right whatever to use the name Miss Velvet or Blue Wolf, or any combination of them, and should be enjoined from doing so.

64.  The service mark Miss Velvet and the Blue Wolf, whether together or separately, belongs entirely to plaintiffs.

65.  No former employee of an organization has any right to a service mark belonging to the organization, especially one who quits in violation of her fiduciary obligations, and thereby causes the owner of the organization to default on its obligations.

66.  Defendant is thus infringing plaintiffs' service mark, and is liable for damages.

67.  Moreover, defendant's unauthorized use of the service mark is considered to be irreparable harm as a matter of law, pursuant to 15 U.S.C. § 1116(a).

## THE REGISTRATION APPLICATION TO THE PTO

68.  In June 2021, as defendant's intentions became clear, plaintiff Hauman prepared and filed an application with US Patent and Trademark Office ("PTO") to register the service mark "Miss Velvet and the Blue Wolf." A copy of the application is annexed as Exhibit B.

69.  The mark was published in the Trademark Official Gazette on May 30, 2023. A copy of the Notice of Publication is annexed as Exhibit C. The service mark is thus presumptively valid and entitled to registration on the Principal Register.

70.  Defendant Fisher has filed a Notice of Opposition to the filing, and plaintiffs' response to that Notice is due July 23, 2023.

71. In her Notice of Opposition, defendant falsely alleges, among other things, that she was the sole and exclusive owner of the service mark Miss Velvet and the Blue Wolf at all times, and that plaintiffs have no such rights.

72. This Court has concurrent jurisdiction with the PTO to determine the validity and registrability of the service mark, and plaintiffs respectfully ask this Court to take jurisdiction of the entire controversy, and adjudicate as well the equitable relief and the damages to which plaintiffs are entitled.

73. To aid this Court's exercise of jurisdiction over the entire controversy, plaintiffs also seek a preliminary and permanent injunction against defendant's further proceedings in the action pending between the parties in the Supreme Court of the State of New York, County of New York, which we now describe.

## THE SUPREME COURT LITIGATION

74. On August 2, 2021, defendant Fisher commenced an action against these plaintiffs in the Supreme Court of the State of New York, County of New York (*Fisher v Hauman & Channel Communication LLC*, Index No. 654717/2021).

75. Belying any claim of urgency and irreparable harm, defendant proceeded by simply filing a summons with notice on that date, without a complaint or motion papers.

76. Seven weeks later, on September 22, 2021, defendant filed extensive motion papers seeking a preliminary injunction, an accounting, and damages against the plaintiffs here.

77.  In those papers, defendant falsely contended, among other things, that she was the sole and exclusive owner of the service mark Miss Velvet and the Blue Wolf, as well as of two marks which plaintiffs had begun to use after defendant quit, namely The Blue Wolf or The Blue Wolf Experience.

78.  In fact, defendant never used any of those service marks in commerce, enjoyed no public reputation of such use, and had no exclusive rights to such use.

79.   Defendant further claimed that moneys were due to her, and demanded an accounting of moneys spent by and for the Band, and damages.

80.  But defendant has never had any contract with the plaintiffs, and no contractual or fiduciary rights to an accounting.

81.  If anything, defendant had a fiduciary relation to plaintiff Isotopia, as her employer, as a matter of law.

82.  Defendant was, by her own admission, an employee of plaintiff Isotopia, and signed agreements so stating. See Exhibit A.

83.  A member of a band who quits has no right to take the service mark with her and use it thereafter.

84.  Any employee of an organization, no matter how small, has no right to take the organization's service mark with her when she resigns, absent some agreement or public perception to the contrary.

85.  Both plaintiffs and the six remaining Band members have always intended–and continuously demonstrated to the public–that the name "Miss Velvet and the Blue Wolf" applies to the Band as a whole, not to any particular member of it.

86.  The public perception was that the Band as a whole was known by that name.

87.  The public perception was, and had always been, that the plaintiffs were solely responsible for the quality of the musical services, recordings and merchandise being sold under that name.

88.  However, despite that public perception, on September 23, 2021, the Supreme Court granted an *ex parte* temporary restraining order ("TRO") against the plaintiffs. A copy is annexed as Exhibit D.

89.  Among other things, the TRO enjoins the plaintiffs:

(1) from dissipating, using, expending, consuming, transferring, or conveying all assets, including monies, held in Defendants' possession or custody, belonging to Plaintiff or to her band, "Miss Velvet & The Blue Wolf' (the "Band"), and in particular, the bank account held by Defendants at Citibank, N.A. in the name of Channel Creations LLC, account number XXX4115, containing moneys received from Plaintiff or from activities of the Band;

(2) from continuing to advertise, promote, market, or benefit from or otherwise use in interstate or intrastate commerce the trade name "Miss Velvet & The Blue Wolf," or the "Blue Wolf Experience" or any other name confusingly similar to "Miss Velvet & The Blue Wolf"; and

(3) from taking any steps to prosecute Defendant Hauman's pending application filed with the United States Patent and Trademark Office to register a trademark in the name "Miss Velvet and The Blue Wolf," Serial No. 90863383.

90. Plaintiffs appeared in the action and opposed this unlawful interference with their federal trademark rights, but the New York State Supreme Court has continued the "temporary" restraining until the present day, nearly two years later.

91. That Court has never converted the TRO to a preliminary injunction, which would have required defendant to post an undertaking, pursuant to § 6312(b) of the New York CPLR.

92. The Court has simply extended the TRO several times (as recently as June 26, 2023; see Exhibit E), and has denied plaintiff's repeated applications and motions to either vacate the TRO or require defendant to post an undertaking, as required by law.

93. Thus defendant has it both ways: She has a preliminary injunction but has not been compelled to post an undertaking, a situation which would be unlawful in this Court pursuant to Rule 65(c), which requires one for either a TRO or an injunction.

94. Thus plaintiffs have no security to recover damages caused them by what is plainly an illegal and unconstitutional order.

95. Plaintiffs are thus apparently illegally enjoined from using their valuable service mark "Miss Velvet and the Blue Wolf" continuously owned and used by them since 2016, and from continuing to prosecute their application to register the mark with the PTO.

96. Such an injunction is in violation of long-standing federal laws and authorities which bar any state court from enjoining anyone from asserting federal rights which they may possess.

-14-

97.   The practical effect of the TRO is either to force plaintiffs to forego the prosecution of their federal trademark rights in the PTO, or to risk being held in contempt of court in the State Supreme Court.

98.  Defendant has already brought one unsuccessful proceeding for contempt of court in the State Supreme Court, and plaintiffs should not have to be subjected to another one for pursuing their federal trademark rights.

99.   The continuation of the TRO is therefore an egregious violation of plaintiffs' constitutional rights to due process of law.

100.  It is also an attempt to bar plaintiffs from exercising their rights under federal trademark law.

101.  The deprivation of such rights constitutes irreparable harm.

102.  Plaintiffs have no adequate remedy at law.

103.  Defendant should be enjoined from enforcing the TRO with respect to any actions which plaintiffs may take to enforce their trademark rights, and their right and obligation to submit any materials in support of their registration application to the PTO.

**THIS COURT HAS JURISDICTION OVER THE ENTIRE CONTROVERSY.**

104.  This Court has concurrent jurisdiction with the PTO to determine the plaintiffs' rights to the service mark, and plaintiffs request that it stay further proceedings there, and adjudicate the plaintiffs' rights against defendant in their totality.

105.  This Court has subject-matter jurisdiction over all of plaintiffs' claims, and plaintiffs are entitled to invoke such jurisdiction.

106.  Pursuant to 28 U.S.C. § 2283, this Court may stay proceedings in the New York State Supreme Court "where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

107.  There is no authority whereby a state court can lawfully enjoin an applicant from prosecuting her trademark rights in the PTO.

108.  Although state courts have concurrent jurisdiction over Lanham Act claims, only the PTO can register a service mark, and only registration by the PTO can provide the significant legal and equitable rights granted thereunder to the successful applicant.

109.  The "temporary" restraining order is thus an unconstitutional violation of plaintiffs' right to pursue its service mark registration.

110.  This Court has jurisdiction to vacate the TRO, because it is not a final judgment.

111.  This Court is also not barred by the Rooker-Feldman doctrine from reviewing the State court proceedings in their entirety, because there is no final judgment.

112.  Given the range of legal disputes between the parties, plaintiffs now bring this action, asking this Court to adjudicate all of the issues between the parties, including the validity of plaintiffs' registration, the ownership of the service mark, the damages caused by defendant's infringement of the mark, and by her breach of contract and fiduciary obligations.

## FIRST CAUSE OF ACTION
## (Infringement of Service Mark; Lanham Act)

113.  Plaintiffs re-allege paragraphs 1 through 112.

114.  Pursuant to 17 U.S.C. §1125(a), defendant is liable to plaintiffs, because her use in commerce of the service mark Miss Velvet and the Blue Wolf constitutes a false designation of origin and of fact, and is likely to cause, and has already caused, confusion and deception as to the origin of the products and services bearing said service mark.

115.  Moreover, it constitutes deception and confusion as to the origin, sponsorship, or approval of plaintiffs' and the Band's musical identity.

116.  Moreover, in defendant's commercial advertising or promotion, she is misrepresenting the nature, characteristics, qualities, and geographic origin of plaintiffs' musical identity and reputation as Miss Velvet and the Blue Wolf.

117.  The service mark Miss Velvet and the Blue Wolf is entitled to the highest degree of protection, because it is a fanciful and inherently distinctive name and identifier for a musical group.

118.  By reason of plaintiffs' extensive use of that service mark throughout the world, the name has become and is well and favorably known throughout the United States and in foreign countries, as identifying the Band.

119.  The plaintiffs have built up an extensive business by reason of the good will and reputation attaching thereto, and have acquired common law trademark rights therein, and the exclusive right to the use thereof.

-17-

120.  Plaintiffs and the Band have enjoyed extensive publicity as such, and the public has associated the service mark with the many public musical performances and recordings created by the Band and issued by the plaintiffs.

121. Defendant's misappropriation of the name Miss Velvet and the Blue Wolf does not distinguish her performances and recordings from those offered and operated by the plaintiffs.

122.  Defendant's actions have caused actual confusion, and at least a likelihood of confusion, as to the source of music performed and created by the Band known as Miss Velvet and the Blue Wolf.

123.  Defendant's actions have caused and will cause irreparable harm, not readily compensable in damages.

124.  Defendant's actions have also caused significant financial damage to plaintiffs.

125.  Plaintiffs are therefore entitled to a declaration that they are the owners of the service mark, to a preliminary and permanent injunction barring any use of the mark or any portions thereof, and to an award of damages and legal fees.

## SECOND CAUSE OF ACTION
### (N.Y. Gen. Business Law § 360-L)

126.  Plaintiffs re-allege paragraphs 1 through 125.

127.   Defendant's use of the service mark Miss Velvet and the Blue Wolf in commerce has deceived and misled the public as to the identity of the source of the music produced, composed, recorded and distributed by the plaintiffs.

128.   Said use is likely to cause, and has caused, injury to plaintiffs' business reputation or of dilution of the distinctive quality of the plaintiffs' service mark.

129.  Said use and the injury caused are grounds for injunctive relief pursuant to New York Gen. Bus. L. § 360-L.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

130.  Plaintiffs re-allege paragraphs 1 through 112.

131.  The Band was contractually obliged to perform for the post-COVID re-opening of Central Park's Summerstage on June 27, 2021, as an opening act for George Clinton and his group, Parliament Funkadelic.

132.  Defendant was contractually obliged to plaintiffs to perform with the Band on that occasion and to provide her services as a vocalist, and she had agreed to do so.

133.  By cancelling and refusing to perform, defendant breached her contract with the plaintiffs, who had fulfilled whatever obligations they had to the defendant.

134.  Defendant's breach caused plaintiffs to incur financial damages and loss of reputation, and defendant is liable for such damages.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Contract)

135.  Plaintiffs re-allege paragraphs 1 through 112.

136.  At the time defendant quit and refused to perform, plaintiffs were under contract to UAA to perform services, consisting of preparing for and participating in recording contracts, appearing at public performances and other services.

137.  The contract explicitly required the performance of services of each and every member of the Band, including the defendant.

138.  Defendant was aware of these contractual obligations, and had signed agreements with UAA and others to perform those services.

139.  Defendant's refusal to perform was willful, and was intended to damage the plaintiffs by making it impossible for plaintiffs to fulfill their obligations.

140.  As a direct result of defendant's actions, plaintiffs were caused to be in breach of their contractual commitments to UAA, and have suffered financial and reputational damage, and defendant is liable for such damages.

### FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Obligations)

141.  Plaintiff re-alleges paragraphs 1 through 112.

142.  At all times relevant, defendant was an employee of plaintiff Isotopia, and acknowledged that status on several occasions.

143.  As an employee, defendant had fiduciary obligations to her employer to act in the highest good faith, and to protect the plaintiff's confidential information entrusted to her.

144.  An employee's fiduciary obligations not to act against an employer's interests continue even after the employee resigns.

145.  Among such confidential information was the details of plaintiffs' contractual obligations, its intellectual property, and its future plans for recording contracts and appearances.

146.  By abruptly resigning and using that confidential information for her own purposes, and by falsely claiming ownership of the service mark Miss Velvet and the Blue Wolf, defendant has violated, and continues to violate, her fiduciary obligations to the plaintiffs.

147. Defendant's breach of her fiduciary obligations caused plaintiffs to incur damages and loss of reputation, and defendant is liable for such damages.

148.  Defendant's breach of her fiduciary obligations also caused extensive damage to the other members of the Band, which plaintiffs were obliged to cover.

## SIXTH CAUSE OF ACTION
### (Abuse of Process)

149.  Plaintiff re-alleges paragraphs 1 through 112.

150.  On or about March 2022, defendant's counsel served a copy of the TRO on Citibank, where plaintiffs maintained several personal and business accounts.

151. As a direct result of that action, Citibank restrained plaintiffs' accounts, as if the TRO had been a restraining order arising from a judgment.

152.  But there was no judgment; the TRO only precluded plaintiffs from spending certain sums, but did not entitle defendant to any positive relief, including any restraints of plaintiffs' accounts which had nothing to do with the defendant.

153.  Nor did the TRO mention a specific amount of money, unlike a judgment or restraining notice.

154.  Service of the TRO on Citibank caused a restraint to be placed on all sums in all of plaintiffs' accounts, and the restraint was not released for several months.

155.  Citibank's counsel later admitted to plaintiffs that their actions were a mistake, and that the bank should not have restrained any of plaintiffs' accounts.

156.  By authorizing her counsel to seek to restrain plaintiffs' accounts, defendant sought to harm plaintiffs without excuse or justification.

157.  The actions of defendant's counsel were an attempt to obtain a collateral objective that was outside the limited purpose of the TRO.

158.  The restraint on plaintiffs' accounts was an abuse of process.

159.  Defendant is liable for the abuse of process caused by her counsel, who were her agents for those unlawful actions.

## SUMMARY OF DAMAGES

160.   As a direct result of defendant's actions as above described, plaintiffs have suffered significant monetary damages, and such damages continue to accrue. Among those damages are the following:

> $31,200 for storage of MVBW vinyl ($1300/ month between NYC, UK and Nashville distributors; charges accrue at that rate every month due to the TRO)
> $13,800 product charge-back fees over 2 yrs.
> $65,000 to re-record the album (Dreamland Studios NYC and Asheville NC )
> $5000 to create a new band logo
> $7500 to create new album art

$25,000 to create new merchandise  (t-shirts, hoodies, stickers, etc.)

$12,000 for production and shipping of new vinyl album

$255,000 for UK tour to start over with a new name, including flights, hotels, bus rental, promotion

$635,000 for US tour with George Clinton to start over and build the new name, including flights, hotels, bus rental for 81 days

$135,000 for Dec 2022-Feb. 2023 shows which was not paid

$80,000 for new videos and photography

$6500 for a new website

$40,000 for new radio campaign

161.   Moreover, defendant's actions caused the cancellation of future shows which had been committed for the next two years. That loss was projected at $600,000 (fee of 10K a show for 60 shows), and $120,000-$150,000 in merchandise sales at live shows.

## DEFENDANT'S WEALTH AND MALICIOUS INTENT

162.  Because plaintiffs are seeking both compensatory and punitive damages, we would set out certain facts regarding defendant's wealth and malicious intent toward the plaintiffs.

163.  Defendant Miasha Fisher is the heir to the Fisher Brothers family fortune. Her father was a major presence in the New York real estate market, but was tragically killed in a plane crash in 2003 when she was a teenager. See https://nypost.com/2003/04/05/crash-miracle-plane-teen- survives-as-ny-developer-dad-dies/

164.  The Fisher family is worth $2.1 billion, according to Forbes Magazine, and defendant Fisher herself $250 million, according to other published reports.

165.  The wilful and destructive actions of the defendant are sufficient to warrant an award of punitive damages, and in such cases, the wealth of the defendant is a significant consideration.

## RELIEF DEMANDED

WHEREFORE, plaintiffs demand relief as follows:

1. On their first cause of action: (a) a preliminary and permanent injunction barring defendant from continuing to advertise, promote, market, or benefit from or otherwise use in interstate or intrastate commerce the service mark "Miss Velvet," or "Miss Velvet & The Blue Wolf," or any part thereof, or any other name confusingly similar to "Miss Velvet & The Blue Wolf"; (b) a preliminary and permanent injunction barring defendant from continuing to litigate her claims in the Supreme Court of the State of New York, County of New York in Index No. 654717/2021 regarding the aforesaid service marks "Miss Velvet & The Blue Wolf," or any part thereof, or any other name confusingly similar to "Miss Velvet & The Blue Wolf"; (c) compensatory and punitive damages in such amounts as the Court and a jury may determine, but not less than $2 million; and (d) legal fees;

2. On their second cause of action, a preliminary and permanent injunction barring defendant from continuing to advertise, promote, market, or benefit from or otherwise use in interstate or intrastate commerce the service mark "Miss Velvet, or "Miss Velvet & The Blue Wolf," or any part thereof, or any other name confusingly similar to "Miss Velvet &

The Blue Wolf"; compensatory and punitive damages in such amounts as the Court and a jury may determine, but not less than $2 million; and legal fees;

2. On each of their remaining causes of action, compensatory and punitive damages in such amounts  as the Court and a jury may determine, but not less than $2 million;

Together with such other relief as may be just and proper.

Dated: New York, New York
　　　July 21, 2023


                                LAW OFFICE OF RICHARD A. ALTMAN
                                Attorney for Plaintiffs
                                150 East 56th Street, Suite 12B
                                New York, NY 10022
                                212.633.0123
                                altmanlaw@earthlink.net

                                TIAJOLOFF & KELLY LLP
                                Attorneys for Plaintiffs
                                405 Lexington Avenue, 37th Floor
                                New York, NY 10174
                                212.490.3285
                                ekelly@tkiplaw.com